[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This is a petition for assessment of damages following condemnation of land by the State of Rhode Island acting by and through its Director of Transportation. Jurisdiction in this Superior Court is pursuant to § 37-6-18, R.I.G.L.
The plaintiff-petitioner is Capital Properties, Inc. It will hereinafter be referred to as the plaintiff. The defendant is the State of Rhode Island and will be noted hereafter as the State.
I
CASE TRAVEL
On November 13, 1987 the State took by condemnation, portions of three lots of land owned by the plaintiff which are located in the so-called Capital Center Project. As required by statute and Constitutional mandate, the State determined the fair market value of the taken land, 93,345 square feet, to be $2,599,050. and paid that amount to the plaintiff. The plaintiff disagreed with the State's determination of the fair market value of the land, and thereafter on April 6, 1988, within the time permitted, and pursuant to § 37-6-18 filed this petition for assessment of damages by a jury.
The case was reached for trial on December 2, 1991 and at that time, plaintiff withdrew its claim for a jury trial. Trial by the Court sitting without a jury thereafter followed and concluded on December 12, 1991. Decision in accordance with Rule52 R.C.P. is herein made and entered.
II
LAW OF THE CASE
In this State, a landowner whose property is taken by the State in condemnation proceedings is entitled to just compensation for the taken property. Article I § 16 R.I.Constitution. Assembly of God Church v. Vallone, 89 R.I. 1, 9 (1959). Just compensation translates itself into the fair market value of the property at the time of taking. J.W.A. Realty, Inc.v. Cranston, 121 R.I. 374 (1979); Corrado v. ProvidenceRedevelopment Agency, 117 R.I. 647, 653 (1977). Where, as in this case, there is only a partial taking from each of the plaintiff's three parcels or lots, it is entitled not only to the fair market value of the land taken, but also, any special or peculiar damages which result to the remaining land. Parrillo v.Director of Public Works, 112 R.I. 427, 435 (1973). In this proceeding, the plaintiff is not claiming any severance damages to any of its remaining lands and consequently, no further consideration of severance damage will be noted.
The plaintiff, by bringing its petition for assessment of damages, has the burden of proving what the fair market value of its taken land was on the date of taking. Nasco. Inc. v.Director of Public Works, 116 R.I. 712, 721 (1976). That fair market value amount should be based upon the most advantageous and valuable use of the land when taken. Sweet v. Murphy,473 A.2d 758, 761 (1984). In short, the plaintiff here is entitled to be put in as good position, pecuniarily, as it would have been if its property had not been taken. Assembly of God Church v.Vallone, 89 R.I. 1, 9 (1959). As noted by Judge Kelleher inNasco. Inc. v. Director of Public Works, 116 R.I. 712, 721 (1976) the plaintiff is entitled to an amount of damages that will accomplish that purpose and "not a penny more." In that regard, in determining the fair market value of the plaintiff's taken land, any enhancement of the value of the plaintiff's taken land by virtue of the moving of the Moshassuck and Woonasquatucket Rivers or the construction of the granite river walls brought about by the condemnation procedure should be excluded. Fuller v. Rahill, 120 R.I. 832 (1978); United Statesv. Reynolds, 397 U.S. 14, 25 L.Ed.2d 12 (1970). In addition, any lawful land use restrictions imposed upon the land at the time of taking, such as Coastal Resource Management Council regulations; Capital Center Project Commission regulations and restrictions as well as any applicable zoning restrictions are relevant in order to assist the Court in determining fair market value at the time of taking. Palazzi v. State, 113 R.I. 218, 222-223 (1974).
The fair market value of land taken by condemnation may be determined by various methods of appraisal that are available to real estate appraisal experts who are called upon to determine fair market value of such land. Our Supreme Court has recognized and approved the various methods, depending upon the particular circumstances and conditions of the land involved. WarwickMusical Theatre. Inc. v. State of Rhode Island, 525 A.2d 905
(1987). That Court has stated that the availability of comparable sales of similar properties makes the comparable sales method of valuation the best evidence thereof, and "excludes" other methods of valuation. Lataille v. Housing Authority ofWoonsocket, 107 R.I. 75 [109 R.I. 75], 79 (1971); Corrado v.Providence Redevelopment Agency, 117 R.I. 647, 653 (1977). In the WarwickMusical Theatre v. State of Rhode Island case, supra, the Court apparently softened the "exclude" terminology so as to have it read that comparable sales, when available are the "preferredmethod" of valuation in condemnation proceedings. 525 A.2d 905,910 (1987). In any event, the law is equally settled that in a particular case, if the trial justice finds that the subject property is unique or special purpose or special use property, in that event, the use of the comparable sales method of valuation can be inappropriate, and the trial justice may, in his or her discretion, depart from the comparable sales approach method of valuation. Warwick Musical Theatre, Inc. v. State of RhodeIsland, 525 A.2d 905, 910 (1987); J.W.A. Realty, Inc. v. Cityof Cranston, 121 R.I. 374, 381 (1979); O'Donnell v. State,117 R.I. 660, 665 (1977); Hall v. City of Providence, 45 R.I. 167, 168 (1923). The rationale underlying that law simply reflects the fundamental proposition that just compensation to the landowner is the Court's ultimate objective. J.W.A. Realty, Inc. v. Cityof Cranston, 121 R.I. 374, 381 (1979).
III
THE EVIDENCE; ITS WEIGHT AND CREDIBILITY
On November 13, 1987 the State, as previously noted, took by condemnation certain portions of three lots owned by the plaintiff all located within the Capital Center Project area. Those lots are shown as parcels #2, #3 and #4 on various of the trial exhibits. Attention, however, is directed to plaintiff's exhibits 11, 12 and 15 which are most useful in portraying the parcels and the land actually taken from each. Plaintiff'sexhibit 15 shows the parcels or lots in blue color, with a plastic overlay on the exhibit in green color that outlines the lot portions taken. In addition, the exhibit shows by means of a black-striped area in the southeastern corner of lot 3, the portion of that lot taken for the permanent underground utilities easement.
The State, as noted earlier, claims that at the time of the condemnation taking, the 93,345 square feet of land taken had a fair market value of $2,599,050. As required by § 37-6-18R.I.G.L. the State paid that amount to the plaintiff. The plaintiff disputed the fair market value determination made by the State and in its petition for assessment of damages claims that its land on the date of taking had a fair market value of $9,386,250. Accordingly, it seeks additional compensation from the State in the amount of $6,787,200., less $686,400. which represents the value of land conveyed to it by the City of Providence. In summary, the plaintiff, seeks $6,100,800. in this action. It has the burden of proving what it seeks and claims.Nasco, Inc. v. Director of Public Works, 116 R.I. 712, 721 (1976).
In the course of trial, the plaintiff called as witnesses, Joseph R. DeStefano, the President of the plaintiff corporation; Charles Kenny, its real estate expert; Robert Lee Pare, a civil engineer; Romolo Marsalla, Jr., former Executive Director of the Providence Foundation and John Vernon Henderson, a Professor of Economics at Brown University. The plaintiff also introduces 37 exhibits as full exhibits and 14 for purposes of identification. The State in its defense called as witnesses three real estate expert witnesses, Lido Jerome, President of G.L. H.J. Gross, Inc.; Anthony DeQuattro, a Real Estate Specialist with the Department of Transportation and, Norman R. Benedict. The State also called Joshua N. Chopy, a civil engineer and, Wendell J. Flanders, the Chief Engineer for the Capital Center Project and its project construction engineer. The State presented 44 full exhibits and some 19 exhibits for identification purposes only.
Prior to the consideration and evaluation of the overall trial evidence, two trial factors require initial consideration. The first is a consideration of the special nature and character of the land in question, and the second, is the review and evaluation of the expert opinion land value testimony. They will be taken up in that order.
The three parcels or lots involved in this case all originally totalled some 354,338 square feet of land. That land, prior to the inception of the Capital Center Project consisted of old and desolate rail road buildings, tracks and rail yards. It was surrounded by parking lots and old and ill kept buildings bordering on the Moshassuck River, with its litter strewn bed and banks, and Canal Street, which was then by no stretch of the imagination a Blackstone Boulevard.
During the mid-to-late 1970's according to the testimony of Joseph DeStefano and Romolo Marsalla, various civic groups and private financial support groups such as the Providence Foundation conceived and discussed the idea of a so-called Capital Center Project in hopes of injecting new life and revitalization into what was then an unsightly, dormant and degenerating downtown Providence area. The focus of the interested parties centered on a spread of some thirty acres of land which included the old Union Station Building; its railroad yards and tracks; the municipal parking areas and of course the not so pristine Woonasquatucket and Moshassuck river ways. With the assistance of private, federal, state and municipal planning and funds, what developed and followed must certainly be noted as a remarkable and commendable effort by the State; the City of Providence; the Providence Redevelopment Agency; the Providence and Worcester Realty Company (now essentially the plaintiff, Capital Properties, Inc.); the National Railroad Passenger Corporation (Amtrak) and the Federal Railroad Administration. The General Assembly, seizing upon the opportunity enacted Chapter332 P.L. 1981 which created the Rhode Island Special Development District concept and which authorized the creation of special development districts with commissions to organize, manage and control the districts thereby created. On January 27, 1982, an agreement for the Providence Rail Relocation Project was executed, and that effectively gave reality to the Capital Center Project. That agreement and its later counterpart called the Master Property Conveyance Contract, dated December 29, 1982 (Plaintiff's Exhibits 7, 8) provided for the relocation of the old Union Station and its various rail lines and rights of way through what would become the heart of the Capital Center Project. The agreement further provided in detail for design and construction responsibilities; for funding and cost sharing; for land exchange commitments; land regulation, and for maintenance and control of future development. In essence, a unique, special use commercial-residential block of land was created which would serve as the hub and linchpin of the downtown Providence rehabilitation and revitalization movement.
All apparently went well until some two years later when in 1984 the Capital Center Commission and the State began discussions regarding the need for the relocation of the not so sparkling waters of the junk and rubbled waterways of the Woonasquatucket and Moshassuck rivers. The Moshassuck river then ran between parcels 3 and 4 owned by the plaintiff. It objected to the proposed relocation of the rivers because it believed that the relocation project would delay its plans to develop its property. Litigation to enforce its objection was commenced in the Superior Court, and was later resolved, by agreement, on January 16, 1987. (Plaintiff's Exhibit 13). That agreement included provision therein for the State to condemn the land involved in this litigation which was owned by the plaintiff and which would be needed for the river relocations and for road construction by the State on the plaintiff's property. Some seven months later, on September 1, 1987, the State formally authorized condemnation proceedings pursuant to § 37-6 R.I.G.L. and ChapterIII P.L. 1970. On November 13, 1987 it took title in fee simple to certain portions of parcels #2, #3 and #4 owned by the plaintiff. The Capital Center Project map, Plaintiff's Exhibit15, clearly illustrates the three parcels, and the portions taken by the State. The State also took by its condemnation proceeding a permanent underground utility easement consisting of some 1,383 square feet across the southeasterly tip of parcel #3. The plaintiff, however, retained surface rights use over the underground easement. In general summary, the State took some 84,528 square feet of dry land and some 8,817 square feet of riverbed or wet land. It also took 1,383 square feet of underground utility easement land. All of the land taken was vacant and unimproved.
At the time of condemnation on November 13, 1987, the plaintiff's three parcels or lots consisted of some 354,338 square feet of land. Approximately 62% of that land total appears to have been subject to Coastal Resource Management land use regulations, as well as to tidal water regulations. The Moshassuck River, in its natural state, ran almost center between plaintiff's parcels #3 and #4. The Woonasquatucket River cut into and ran through the southerly corner of plaintiff's parcel #2. The 93,345 square feet of land taken from the plaintiff's three parcels was actually taken by the State for the purpose of relocating, that is moving the Moshassuck River from the almost center of plaintiff's parcels #3 and #4 over to the easterly side of parcel #3 running along Canal Street; for the widening of Stillman Street so as to provide more ample roadway access to the plaintiff's and other Capital Center properties, and, for the construction of a roadway, dead ended by a cul-de-sac, which totally serves to accommodate plaintiff's parcels #3 and #4.See, Plaintiff's Exhibit 13. Without questioning the legality of the condemnation proceedings, it appears to have been more for the benefit of plaintiff's remaining land than for public use and purpose. The condemnation process, as well as the fact that the properties were part of the Capital Center Project resulted not only in the improvement and betterment of plaintiff's use, utilization and value of its three lots, but in addition served to effectively assure their quick release from the Coastal Resources Management and tidal water restrictions. See, e.g.Plaintiff's Exhibits 44 and 45.
Plaintiff's three parcels from which the 93,345 square feet of primarily lot perimeter land was taken should also be viewed in the context of their assured location valuation that was initially spawned by the Rhode Island Special DevelopmentDistrict Enabling Act, § 45-24.4.2 R.I.G.L. (P.L. 1981, Ch.332). That 1981 legislation, with the later execution of the January 27, 1982 Providence Rail Relocation Project Cooperative Agreement and the December 29, 1982 Master Property Conveyance Contract (Plaintiff's Exhibits 7, 8) was the progenitor of the Capital Center Project. That project, especially after the initial construction and railroad relocation work began, served to automatically self create high real estate values for all of its component properties, including the plaintiff's three parcels here involved. The Capital Center Project Commission, authorized by § 45-24.4 et seq., and created by Ordinance of the City of Providence, (Plaintiff's Exhibit 10) enacted Regulations to control and regulate the use, construction, design and planning for the Project, all of which served to effectively insulate its component properties from general downtown Providence real estate market conditions and influences. The project's component properties, including those of the plaintiff concerned in this litigation, became essentially value damage proof. They were value created and sustained by the expenditure of millions of dollars from public funds and governmental funded agencies, and having been so created, they remain protected by barriers of both financial ability and longevity. For example, the adjacent and surrounding land area uses such as the State Capital Building and Grounds; the Roger Williams National Park, the new and modern railroad station with its hidden track system; the planned renovation and beautification of the former Union Station Complex; the adjoining interstate highway systems and the reconstructed and beautified surrounding road ways; walkways, bridges and waterways. All of those bordering land uses and the authority of the Capital Center Commission to determine who comes in and what goes up in the Project certainly guarantee a land value stability that exists nowhere else in the metropolitan and downtown Providence area. See, e.g. Plaintiff's Exhibits 16 and17; Defendant's Exhibits A and CC. Unlike other land values in the metropolitan area, the Capital Center Project property values would appear not to be capable of being affected or influenced by changes in neighborhood, or changes in neighboring land use, or by the neglect of adjoining property owners to maintain their properties. The Capital Center Project component properties, including the plaintiff's three lots in question, are essentially land blocked by value support areas with long term ownership stability and long term financial ability. That uniqueness certainly separates the plaintiff's lots from comparable sales of "ordinary" properties and weakens the probative value of so-called testified to comparable sales. See, e.g. Hall v.City of Providence, supra, at p. 168; Assembly of God Church,supra, at p. 10-11.
This Court, after conscientious review of the trial evidence, and in light of the factual setting in which plaintiff's land is located, finds that the plaintiff's three lots and the perimeter portions taken therefrom, along with that portion taken to construct the cul-de-sac roadway into the plaintiff's land, over the former path of the Moshassuck River, are indeed unique, and constitute special use and special purpose lots, all restricted and regulated by the Capital Center Project Commission's plans and regulations. Plaintiff's Exhibits 16, 17; Defendant'sExhibits A, CC. As such, valuation of the plaintiff's taken land by means of the comparable sales method of valuation is inappropriate. The partial perimeter land takings by the State did not adversely change or affect in any material way the remainder lot values or use capabilities. In fact, as noted earlier, the plaintiff's remainder lot areas were actually enhanced for purposes of their permitted and intended use. Accordingly, in that context, while the comparable sales method of valuation utilized by the real estate experts in this trial were of assistance to them in the ultimate formulation of their respective opinions, the manner of their use, with "judgment call" adjustments as by Charles Kenny, the plaintiff's only land valuation expert who testified, are not applicable to the unique and special purpose properties involved in this case. This Court finds that the before and after condemnation value method utilized by Norman R. Benedict, the State's real estate expert is the most persuasive and credible, and will best serve the real purpose of this litigation, which is to determine what the fair market value of the plaintiff's taken land was on November 13, 1987. In accepting, as most persuasive and credible, the appraisal of fair market value by Mr. Benedict, the Court is not thereby rejecting as not credible the appraisals made by the State's other two real estate experts, Mr. Jerome and Mr. DeQuattro, but believes that Mr. Benedict's testimony, and his explanation of the reasons for, and the manner by which he formed his opinion regarding the fair market value of the plaintiff's land as of November 13, 1987 was more probative and persuasive. In that regard, this Court notes, as did Judge Kelleher inNasco, Inc. v. Director of Public Works, 116 R.I. 713 [116 R.I. 712], 716-719 (1976), that while in condemnation cases it is generally believed that the trial thereof simply "evolves into a joust" between the two sets of real estate experts, that is not so. An expert's testimony regarding value does not enjoy a preferred status. The trial judge is required to examine and consider the testimony ofall the witnesses and to accord that evidence only such weight as it warrants when considered in the light of all of the trial evidence, whether it be plaintiff or defendant's evidence.McHale v. Director of Public Works, 100 R.I. 770 (1966).
Taking up next the review and evaluation of the expert opinion land value testimony presented during the trial. The plaintiff's case was built upon the testimony of Charles Kenny, a partner in Whittier Partners, a Massachusetts realty firm specializing in commercial real estate services and appraisals. His qualifications as an expert in the commercial real estate appraisal and consulting field were accepted by the Court. He was accordingly permitted to offer expert opinion testimony during the trial. He testified that in his opinion, the 93,345 square feet of land taken by the State from the plaintiffs on November 13, 1987 had a fair market value of $9,298,080. from which was deducted $686,400. as the value of land conveyed to the plaintiff by the City of Providence leaving a rounded net valuation of $8,700,000. He testified that he was first engaged by the plaintiff to appraise and value the taken land in May or June of 1990. That was, some two and one-half years after the date of taking. He said that he inspected the property sometime in June, 1990, and found it then to consist of undeveloped level open land primarily used for public parking. He testified that for purposes of making his appraisal of value, he acquainted himself with the local real estate market conditions; with economic indicators such as employment and unemployment factors and with real estate market vacancy and sales trends. He stated that he also acquainted himself with local commercial office market conditions in the Providence area and compiled statistics and data from various sources such as the Ryan-Elliott Reports and from local realtors. From all of his source data, he concluded a "just under" 15% vacancy rate in the commercial office market in the later part of 1987. He also testified that he "tracked" a trend in that market that showed 1987 to have had the lowest vacancy rate. He testified that in his opinion, 1987 was the peak year for the sale of commercial office real estate properties, and that in 1988 and 1989 a commercial realty vacancy ratio trend increase began in that market. He testified that in his opinion, in November 1987, the highest and best use for the subject properties from which the partial takings were made, were for mixed office building; residential, such as hotel and apartment, and some commercial retail uses. He labeled the Capital Center area wherein the land was located as very unique, and a pre-eminent piece of property in the Providence area. In arriving at his opinion of the date of taking fair market value, he employed the so-called fair market value by use of comparable sales method. He identified ten various comparable sales used by him. Of those ten, two were not actually sales, but instead only options to purchase. All were transactions that took place from 1988 to October 1990, a time period after the date of condemnation in this case. He testified as to the various adjustments that he made to the comparable sales such as for time; location; size of property; character of site; physical condition; conditions of sale; market conditions, etc. The comparable sales that he used for purposes of forming his opinion with regard to the fair market value of the land in question ranged in square foot price of sale from $23.00 to $184.00. He then concluded a general range from those sales of $60.00 to $110.00 per square foot. After making various adjustments to those comparables he "upgraded" his range to $85.00 to $139.00 per square foot. He explained each of his various adjustments as being guides to a "judgment call" which went into his final opinion as to fair market value of the subject properties as of November 13, 1987. His final valuation figure amount of $9,298,080. was arrived at as follows. Of the 93,345 square feet of land taken, 84,528 square feet of that land was termed "dry land". That, he valued at $110.00 per square foot for a total valuation of $9,298,080. Another portion of the taken land, consisting of 8,817 square feet, was termed "riverbed" or "wet" land and he valued that at $10.00 per square foot for a total valuation of $88,170. The sum total of both "dry" and "wet" land amounted to $9,386,250. Kenny then deducted from that total fair market value figure, the amount of $686,400. which represented the value of 6,240 square feet of land conveyed to the plaintiff by the City of Providence so as to enable the plaintiff to "square off" the southerly portion of its remaining parcel #2. That 6,240 square feet of land he had valued at $110.00 per square foot. Accordingly, his opinion as to the fair market value of the plaintiff's 93,345 square feet of taken land is actually $9,386,250. The deduction of the claimed $686,400. value of the 6,240 square feet of land conveyed to the plaintiff by the City of Providence has really no effect on his opinion oftotal fair market value of the taken land, but instead is relevant only as having been a set-off to the gross amount actually due to the plaintiff, from the State.
Mr. Kenny also appraised the plaintiff's taken land by means of the so-called income analysis method of appraisal. He did this on the basis of the income stream projected from the lease between the plaintiff, and the Citizens Bank for the building located on the remainder of plaintiff's parcel #3. That lease, dated June 8, 1987 and having a term of 99 years, was determined by Kenny to bestow a present day value of $100.00 per square foot upon the land on which it is located. That land was described by Kenny as consisting of 40,033 square feet. Accordingly, by his computations, which appear accurate, the plaintiff's land had a then present day market value, as of November 13, 1987 of $7,925,000. Kenny testified that he used the income analysis method of appraisal only for the purpose of substantiating his earlier comparable sale method of valuation opinion, and to which he had given the greater weight of reliability.
The Court rejects the land value opinions of Mr. Kenny. While certainly a most pleasant and qualified real estate expert, he was nonetheless a not entirely candid and truthful witness. The Court finds that the after date of condemnation comparable sales utilized by him so as to arrive at his ultimate fair market value opinion were not only unreliable comparable sales, but were also so distorted by what he termed his "judgment call adjustments" as to render them as valueless as his ultimate opinion. It is interesting for example to compare his inflated market value opinion comparable sale market trend adjustment component which he said peaked in 1987 the date of condemnation, and which he testified remained stabile through 1988, with what the plaintiff's witness, Professor John V. Henderson testified to regarding that market trend. Professor Henderson testified that according to his "raw number" sales trend figures they showed that from 1986 to 1987 there had been a 100% increase in commercial property sales in the Providence area, but from 1987 to 1988, there was a 63% decrease in such sales. Professor Henderson also stated that what followed was a downward sales trend thereafter. Mr. Kenny apparently misconceived the peak sales year for purposes of justifying his inflated and exaggerated fair market value opinion. It is also interesting to note that Mr. Kenny was first actually engaged to appraise plaintiff's taken land values, some thirteen months after the plaintiff had filed its petition for assessment of damages. From that fact, one might reasonably infer that when the plaintiff filed its petition for assessment of damages, it then had no
professional opinion as to land value with which to contradict or dispute what the State had determined fair market value to be. If the plaintiff did have such evidence, it was not presented at the trial. It appears to this Court that Mr. Kenny came into this litigation simply to justify a claim being made for extra compensation. His evaluation of $110.00 per square foot for dry land in the plaintiff's three parcels appears to be something in the nature of a hope of having the Court cut down his exaggerated figure somewhat, but in so doing leave enough of a cushion for substantial extra compensation. That of course is sometimes believed to be the easy way to decide cases of this nature, but is certainly not the correct way. If one were to transpose his square foot valuation over the entire of plaintiff's parcels #2, #3 and #4, the total value amount thereof would embarrass not only Mr. Kenny but the plaintiff as well. That figure would be in the vicinity of some $38,941,000. It's real vicinity value figure, as indicated by Mr. Benedict, one of the State's experts, would be $19,700,000. which would be honest, correct, and not embarrassing.
The expert land value opinion evidence presented by the State came from three witnesses. Lido Jerome, president of G.L. H.J. Gross, Inc.; Anthony DeQuattro, a Real Estate Specialist with the Department of Transportation and Norman R. Benedict of Norman Benedict Associates, Inc., a Connecticut real estate firm specializing in land appraisal and allied realty services.
Mr. Jerome, was originally engaged by the State for purposes of valuing the land to be condemned by the State, for purposes of compliance with § 37-6-18 R.I.G.L which requires the State to pay to the landowner the fair market value of the taken property at the time of taking. Mr. Jerome, the President of G.L. H.J. Gross, like Mr. Kenny, is an experienced and qualified real estate appraiser. He evaluated the land to be taken by the State and determined the value of the 93,345 square feet by means of the comparable sales method of valuation. He selected four comparable sales from a possible seven or eight real estate sales which he believed to be comparable sales. Of the four comparables selected as most relevant to the subject land by Mr. Jerome, one, for 380 Westminster Street, the site of the present U.S. Bankruptcy Court and Social Security Office, dated back to October 31, 1981, and showed a square foot sales price of $29.21. Another comparable for a sale on May 5, 1985 reflected a $44.86 square foot sales price. A comparable sale on June 15, 1984 revealed a $30.45 square foot selling price, and another for October 30, 1985 showed a square foot selling price of $27.93. Utilizing those four comparables, Mr. Jerome after making site, market changes and location adjustments to each concluded therefrom a $50.00 per square foot adjusted value. He then employed a before taking and after taking valuation consideration so as to identify any damages or betterments to the plaintiff's remaining property as a result of the condemnation. Such method of valuation is of course proper in certain takings. Fuller v.Rahill, 120 R.I. 832 (1978). Mr. Jerome used the before and after condemnation valuation method as to each of the plaintiffs three parcels from which had been taken the 93,345 square feet of primarily lot perimeter land. He concluded from his analysis a final adjusted fair market value of the taken land to be $2,089,050.
The State also called as one of its real estate value experts Anthony DeQuattro. He described himself as a Real Estate Specialist in the State Department of Transportation, and as the Specialist selected to review the appraisal report submitted to the Department by Mr. Jerome. DeQuattro after detailing for the Court his extensive and professional background and experience in real estate matters was permitted to testify as an expert in the field of property valuation. He outlined in detail his method and purpose in reviewing appraisals referred to him, such as the Jerome appraisal. As a result of his review thereof, he adjusted the Jerome appraisal upward, so as to reflect therein an increase of $510,000. and he added to it a $1.00 amount representing an agreed upon figure with the plaintiff for certain walkways. The final adjusted State fair market valuation of the plaintiff's taken land, however, on the date of taking, was determined by DeQuattro to be $2,599,050.
Norman R. Benedict was the State's third real estate expert called to testify. He, like Mr. Kenny and Mr. Jerome, determined the highest and best use for the property taken from the plaintiff to be for commercial office use, some residential use, such as for hotel or apartment use, and for some retail commercial use. Mr. Benedict, for purposes of his valuation of the taken property, employed a comparable sales approach and developed that into a before and after condemnation evaluation so as to determine any damage resulting to the remainder of each of the three parcels from which the primarily lot perimeter partial takings had come. He also testified that he used it so as to determine any benefits that may have accrued to the plaintiff's remaining lands as a result of the river relocation and road construction work intended to be carried out by the State. Such considerations are of course recognized in certain circumstances.United States v. Reynolds, 397 U.S. 14, 25 L.Ed.2d 12 (1970);United States v. Miller, 317 U.S. 369, 87 L.Ed. 336 (1943);Fuller v. Rahill 120 R.I. 832, 839-840 (1978).
From a total of seventeen comparable sales, he elected to use only four, one of which was the so-called John Rao sale to Macomber Construction, Inc., on September 15, 1988 for $6,250,000. and the resale of that land by Macomber Construction, Inc. about one month later to the Convention Center on October 18, 1988 for $6,650.000. As a result while he considered four comparable land sales, they actually consisted of five separate land sale transactions. Another of his comparables was the October 1988 sale of the nearby Bonanza Bus Line property and buildings to the Convention Center Authority for $9,258,727 or $66.72 per square foot. To those sales which he deemed to be comparable, he then made the expected and usual adjustments for time, location, market conditions, etc. He then related each of them to each of the three parcels owned by the plaintiff and which are the subject matter of this litigation. By so doing, he concluded what in his expert opinion was the before condemnation and after condemnation value of each of the three parcels. The difference between his before and after fair market values became his fair market value of the particular land taken from each parcel on November 13, 1987. Without recounting each of the meticulous details of his valuation procedure, Mr. Benedict concluded a November 13, 1987 before condemnation fair market value of plaintiff's parcel #2 at $5,500,000.; parcel #3 at $3,900,000. and parcel #4 at $10,300,000. Those valuations totalled $19,700,000. He thereafter concluded the after November 13, 1987 values of the three parcels and found parcel #2 to be valued at $6,000,000.; parcel #3 at $5,900,000. and parcel #4 at $4,800,000. for a total after condemnation fair market value of $16,700,000. Mr. Benedict testified that by using the before and after condemnation method of valuation, he was able to value the particular portions of each lot taken as it related to the whole of that particular lot. By so doing, he was able to then take into account any special encumbrances that might have affected the land value as well as any specific benefits that might be conferred or made to the remaining land in each parcel. It also permitted him to evaluate any severance damage to each of the remaining parcel lands, since the takings here were partial takings from three separate parcels or lots. Mr. Benedict did find and did explain in detail the special benefits he found to have accrued to the plaintiff's remaining parcel lands, such as for example, to parcel #3 which as a direct result of the relocation of the two rivers transformed the remainder of that parcel into a unique new river front and granite wall bounded lot. That of course is apparent when one views the present Citizens Bank Building which sits on that lot and takes advantage of its river walled boundaries on its two sides. Such considerations are proper. J.W.A. Realty, Inc. v. City ofCranston, 121 R.I. 374, 383 (1979). As a point of interest, Mr. Robert Lee Pare, a respected and qualified civil engineer, called as a witness by the plaintiff, testified as to the removal and replacement of the stone walls bordering the rivers and the cost of removal of a portion of an old pier which would benefit the plaintiff's remaining land. He estimated the cost thereof, to be borne by the State, at some $1,100,000. Mr. Benedict also took into account the fact that parcels #2, #3 and #4 prior to condemnation, which consisted of some 354,338 square feet of land actually had to then contend with the 200 feet use restrictions imposed by law on coastal waterway property as well as the need for filing applications for land use approval or relief from the Coastal Resources Commission (§ 46-23-1, et seq.), and from the Army Corps of Engineers, as indicated in the testimony of Robert Lee Pare, the civil engineer who testified for the plaintiff. While it has been shown that in this case, the necessary permits to move the rivers, fill in the riverbeds and build within several feet of the river lines were obtained, all within the space of some two or three months, such phenomenal action on the part of the Coastal Resource Commission and the Army Corps of Engineers does not diminish the reality, that to the ordinary land owner, such quick time approval is unheard of. See for e.g. Ratcliffe v. Coastal Resources ManagementCouncil, 584 A.2d 1107, 1111 (1991) 14 years; Sakonnet Rogersv. Coastal Resources Management Council, 536 A.2d 893 (1988) 7 years; Santini v. Lyons, 448 A.2d 124 (1982) 15 months. Accordingly, to the ordinary prudent buyer, who would have made up one-half of the so called ready and willing arms-length buyer scenario for comparable property sale evaluations, the existence of coastal or federal tidewater regulations on or affecting land to be purchased would certainly be considered as an encumbrance affecting adversely the sale price for the land. To assume otherwise, as did Mr. Kenny, the plaintiff's expert, is to ignore reality. He apparently gave no consideration to the tidal water land restrictions because when he appraised the land in 1990, the Coastal Resources Management Council had already given its assent to construction. Plaintiff's Exhibit 45. However, on the date of condemnation, no assent had been given. In this case, one can reasonably assume that the Capital Center Project properties of the plaintiff, after the agreement between the plaintiff and the State, wherein the State agreed to condemn the plaintiff's river bordering lands to relocate the rivers (Plaintiff's Exhibit 13) was an unbelievable "door opener" and "mover" at Coastal Resources and the Army Corps of Engineers.
In this case, it should also be noted that according to Mr. Benedict's calculations, which appear to be accurate, approximately 62% of the plaintiff's three parcels involved in this litigation, would have been subject to the land use restrictions imposed by the Coastal Resources Management regulations at the time of condemnation. That factor would, just as would a zoning or land use restriction, certainly concern a prudent land buyer, and would certainly factor down a fair market value offer to purchase that property. See, e.g. Palazzi v.State, 113 R.I. 218, 222-223 (1974).
Mr. Benedict also was questioned concerning his consideration, if any, to the use by him of the income analysis method of appraisal with regard to the leased property to the Citizens Bank. He testified that in his experience, which was extensive, he had used that method frequently, but that in this case because of the various contingencies contained in the lease such as those regarding the determination of escalation of rents and how those rents would be influenced by what space and footage would be used and available, it would be impossible to use that method of appraisal. He summed up his opinion by stating that because of the particular lease provisions, he could not use the income analysis method of valuation because it would require too many unreasonable assumptions to be made and used. He testified on cross examination with regard to the particulars of the lease provisions which required both speculation and unreasonable assumptions. His reasoning was most persuasive and credible. A reading of the 103 page lease, Plaintiff's Exhibit 33, by the Court confirms the total accuracy of Mr. Benedict's opinion.
In summary, Mr. Benedict testified that he appraised for value the land in question by first determining its highest and best use, and then, by use of comparable sales which he found and selected, was able to determine the before and after condemnation values of the land and arrive at the fair market value of the taken land at the time of condemnation. He found the prior condemnation value to be $19,700,000. and the after condemnation value to be $16,700,000. From that he concluded the fair market value of the taken land to be $3,000,000.
For purposes of reviewing the material and relevant trial evidence on the issue of the fair market value of the plaintiff's taken land on November 13, 1987 the Court has primarily considered and reviewed the respective expert opinions offered by the four real estate experts who testified at the trial. In so doing, it has not overlooked any of the other and remaining trial evidence. Regarding the issue of the credibility of all of the trial witnesses, this Court is totally satisfied that each and every witness, other than Charles Kenny, testified truthfully and with full candor and frankness. Any disagreements or discrepancies in the testimony the Court finds to be the result of honest recollection and expression, rather than dishonesty.
This Court finds as credible the fair market value opinions of Mr. Jerome; Mr. DeQuattro and Mr. Benedict. The Court finds most persuasive and convincing, however, the overall testimony of Mr. Benedict. He exhibited a clear command of, and total understanding of the unique and special nature of the property concerned. His expert opinion testimony with regard to the details in the appraisal methods employed by him in determining what he considered as material and relevant to his final opinion regarding the fair market value of the plaintiff's 93,345 square feet of land on November 13, 1987 was candid, precise and persuasive. His opinions were most carefully prepared and explained, and most precisely given. From his testimony, considered along with all of the other trial evidence, this Court has been able to determine that the plaintiff has met and carried its burden of proof. It has been met and carried, however, not by virtue of the plaintiff's expert opinion testimony, but instead, by virtue of the evidence and testimony from the State's real estate expert, Norman R. Benedict. From his testimony, taken and considered along with all of the trial testimony and evidence, this Court finds that the fair market value of the 93,345 square feet of plaintiff's land taken by the State on November 13, 1987 to be $3,000,000. The plaintiff having been previously paid $2,599,050. is now entitled to judgment in the amount of $400,950. with interest as provided by statute.
Counsel shall prepare for entry an appropriate judgment consistent with this decision.
IV
STAY OF EXECUTION OF JUDGMENT
Shortly prior to the trial of this case, the State, after motion therefore, was granted permission to file a counterclaim against the plaintiff. That counterclaim filed on November 21, 1991, questioned the plaintiff's legal title to the land which had been taken by virtue of the condemnation proceedings, and its lawful right to the condemnation money paid by the State. The State contended in the counterclaim that the plaintiff's land site was originally tidal, coastal and navigable waters of the State, and owned by the State in trust for the public pursuant to the public trust doctrine recognized in this state. Hall v.Nascemento, 594 A.2d 874 (1991). The plaintiff in answer to that counterclaim asserted its title by virtue of a January 1870 General Assembly Resolution relating to the "Cove Lands". That Resolution, Plaintiff's Exhibit 35, authorized the City of Providence to purchase all of the "cove lands" located "above" the then existing Weybosset Street Bridge. The City of Providence did purchase those "cove lands" by deed dated May 14, 1870.Plaintiff's Exhibit 36. The State, despite that legislative Resolution and later deed, persisted in its title challenge because of what it alleges to be the inadequacy of the Resolution to legally and effectively permit a conveyance of public trust land. Article IV Section 14 of our State Constitution does appear to require more than a simple Resolution, and, the recent opinion of our Supreme Court in Hall v. Nascemento,594 A.2d 874 (1991) when viewed in the light of State Terminal Corp. v.General Scrap Iron, Inc., 107 R.I 24, 28-32 (1970) appears to support the State's position. In addition, opinions from Massachusetts and Vermont do likewise. Boston WaterfrontDevelopment Corporation v. Commonwealth, 393 N.E.2d 356 (1979);State v. Central Vermont Railway, Inc., 571 A.2d 1128 (1989). If the State's counterclaim contention should be sustained, the validity of not only the plaintiff's title to the land it owned, and still owns, in the Capital Center Project, but the titles of other landowners therein are in question. Whether or not title counsel employed by the State in the condemnation proceedings concerned in this case noted the tidal waters — public trust doctrine issue, is not known. Counsel should have, however, since clear nature of the problem was given by the Assent from the Coastal Resources Management Council. Plaintiff's Exhibit 45,
page three, therein. The Court assumes however that title counsel did apparently determine lawful title in the plaintiff, otherwise the State would presumably not have paid it the $2,599,050 condemnation amount.
The title question was not resolved in this case. The Court at the close of the evidence, dismissed the State's counterclaim,without prejudice. It did so because of the absence from the litigation of the Attorney General, who had never been noticed pursuant to Rule 24(d) R.C.P. despite the fact that the legality of the 1870 Resolution of the General Assembly was being questioned. That Rule, of course, pertains to actions wherein the State or an officer, agency or employee is not a party, but nonetheless, while the State is a party here, it is represented by private counsel. The real intention of Rule 24(a) R.C.P. is not to leave the determination of the legality or the constitutionality of a legislative Act or Resolution to private counsel engaged by a state agency. The true purpose of the Rule is to make certain that the Attorney General should be the final judge of whether or not he should be given the opportunity to intervene, and not private counsel.
In addition, the Court believes that other real parties in interest to the title question should have been made parties prior to the trial, or extended at least, the opportunity to intervene. It would appear that even assuming the effective validity of the 1870 legislation which this Court must assume at this time to be valid, that Resolution only refers to those lands "above" the then existing Weybosset Bridge. What is located "above" that bridge is a question of both fact and vital concern. What is below that bridge is of course most interesting as concerns the public trust doctrine, and title to those lands.
For the above reasons, the Court as noted earlier, dismissed the counterclaims, without prejudice, so as to allow the State, or any other interested party, adequate opportunity to consider the filing of an appropriate action, so as to have the question of title to the former tidal basin area properties resolved.
As noted earlier, this Court, for purposes of its finding and decision on the evidence and the issues before it in this case has assumed, as it must, the validity and sufficiency of the 1870 legislative Resolution, until such time as our Supreme Court might declare otherwise. Johnson Wales College v. DiPrete,448 A.2d 1271, 1279 (1982). If that determination were to be made by our Supreme Court, then the plaintiff would not be entitled to the award made herein by the Court, or, to the $2,599,050 previously paid to it by the State.
In view of the above, this Court deems it feasible to order the clerk to stay issuance of execution on the judgment to be entered, for a period of sixty (60) days following entry, within which time, the State, or any other interested party may elect to file any appropriate action wherein the question of the State's public trust ownership of the plaintiff's land, and the plaintiff's title thereto can be resolved. If any such action is filed, this Court will then consider further stay of execution until final resolution of that action. If no such action is filed, then in such event the Court's order staying execution will be vacated and execution on the judgment will issue.